John I. Cooper, H. W. Price, L. W. Price, June Price Danglade, Doris Lee Tammany, Clara May Edwards, John M. Green and True W. Childs Trust, H. W. Price, Trustee and L. W. Price, Successor Trustee to John I. Cooper, Deceased Trustee v. Commissioner.
Cooper v. Commissioner
Docket No. 64967.
United States Tax Court
T.C. Memo 1958-31; 1958 Tax Ct. Memo LEXIS 199; 17 T.C.M. (CCH) 127; T.C.M. (RIA) 58031; 10 Oil & Gas Rep. 115; February 26, 1958
*199 Petitioner trust was created at the expiration of a testamentary trust by the beneficiaries of the latter conveying their interest in bank stock and realty to petitioner trust. Petitioner trust was to continue for 10 years and trustees were given broad powers and there were many provisions rendering the trust analogous to corporate organization. Held, petitioner was taxable as an "association" in the same manner as an association under section 3797(a)(3), I.R.C. of 1939. R. L. Letton, Esq., for the petitioner. Sylvan Siegler, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in income tax against the John I. Cooper, H. W. Price, et al. Trust, hereinafter referred to as the petitioner, as follows: Year
Deficiency
1950
$10,321.22
1951
31,749.77
1952
26,915.32
1953
15,805.46
The single issue for determination is whether, during the years before us, the petitioner is an association taxable as a corporation within the meaning of section 3797(a)(3), Internal Revenue Code of 1939. Findings of Fact Some of the facts have been stipulated and are found accordingly. *200 The petitioner herein is the John I. Cooper, H. W. Price, et al., Trust, H. W. Price and L. W. Price, Trustees. The petitioner will sometimes be referred to as the trust. Petitioner filed fiduciary income tax returns for estates and trusts (Form 1041) for the taxable years 1950 and 1951 with the then collector of internal revenue, and for the years 1952 and 1953 with the district director of internal revenue for the district of Kansas. The petitioner was created on October 19, 1949 by the execution of a written trust agreement. The parties to the agreement were the then beneficiaries of the John M. Cooper trust, hereinafter referred to as the testamentary trust. The testamentary trust was created in 1914 upon the death of John M. Cooper, ancestor of all the beneficiaries of petitioner. The testamentary trust included all of the residuary estate of the testator and provided that upon termination of the trust (35 years duration) the property would be distributed in equal shares to the testator's surviving children or their heirs. The testamentary trust continued for the 35 year term provided in the will, or until October 19, 1949, the date upon which petitioner was created. On *201 the date of termination, John I. Cooper, the only surviving son of the testator, and H. W. Price, a grandson of the testator, were trustees of the testamentary trust. As of October 19, 1949, the assets of the testamentary trust consisted of the following: Cash on hand
$159,716.32
Real estate, book value
132,069.30
315 shares capital stock of Baxter
State Bank
21,960.00
Notes receivable
3,000.00
Accounts receivable
12.63
U.S. Bonds, Series G
38,365.00
Office fixtures
200.00
Total
$355,323.25 On October 15, 1949 and October 19, 1949, the testamentary trust distributed to each of its beneficiaries his or her share of all the trust assets including the cash on hand and all of the proceeds of the Series G bonds. Pursuant to the terms of the trust agreement executed on October 19, 1949, which created the petitioner, the beneficiaries of the testamentary trust, joined by the wives of certain of the beneficiaries, conveyed to John I. Cooper and H. W. Price, as trustees for the petitioner, all of the assets of the testamentary trust with the exception of the cash and Series G bonds. Each such beneficiary contributed to petitioner his or her distributive share *202 of the undivided assets of the testamentary trust and thereby became beneficiaries of the newly formed inter vivos trust. The trust instrument, after setting out the proportions in which each beneficiary was owner of the property conveyed to the petitioner, provides, in part, as follows: "WHEREAS, said property hereinafter described, has an income producing protential which can be better protected by a unified control, management and operation thereof, until such time as the trustees named hereunder, in the exercise of the discretionary powers conferred upon them, or their successors, may sell and convert into cash, said property, real and personal, or any part thereof, for distribution among the grantors herein, their heirs and assigns." The instrument then described in full the realty and capital stock conveyed to petitioner and set the term of the trust at 10 years. Then follows the powers and duties of the trustees and purposes of the trust, which are set out as follows: "1. Said trustees, or their successors, shall have the full and complete management and control of all of said property, real and personal, with power to lease and rent the same, collect the rents therefrom, *203 and with power in said trustees to sell and dispose of the whole or any part or parts of said trust estate, either together or in parcels and either for cash, or upon terms as to said trustees may seem proper, and with power to lease said real estate or any part thereof for mining purposes or otherwise, for the term or period not to exceed ten years from the date of said lease, whether or not said lease period or term shall or may extend beyond the fixed term of this trust, and collect the rentals or royalties therefrom, to execute and deliver all deeds, leases, contracts and other instruments necessary and proper to carry out the purposes of this trust, and with power to borrow money, pledge or mortgage said property or any part thereof if and when in the discretion of said trustees the same may be necessary to obtain funds to carry out the purposes of this indenture, and the power to invest the funds of said trust in real or personal property only and whenever in the judgment of said trustees said investments shall be necessary and proper to protect and preserve the trust estate or part thereof, or the potential income therefrom. It is the intention of the grantors herein to invest *204 said trustees the full and complete discretionary power in the management, control, liquidation and distribution of the trust estate hereby created. "Said trustees shall keep true and correct books of records and account of their doings under the powers hereby conferred upon them, which said books and records shall be open to the inspection of the grantors herein at all reasonable hours. The trustees shall annually and during the month of January each year furnish to each of the grantors herein a balance sheet statement of their operations during the preceding calendar year. "The main purpose of this trust is to provide for an economical and centralized management and operation of the property of this trust, until the liquidation and distribution of said trust property has been completed as herein contemplated by the trustees for the benefit of the beneficiaries; the holding together all of said property, and the various parts thereof, so that the maximum return may be received therefrom either from rentals or royalties, or from the sale of all or any part thereof, during the term hereof as, in the discretion of said trustees, shall be for the best interests of the beneficiaries; *205 to vest in the trustees full power and authority in all things to carry out the purposes and intention hereof as said trustees in their discretion, may find and determine to be for the best interest of the trust and beneficiaries thereunder, retaining in the grantors, their heirs and assigns the right to have and receive their proportionate share of the distribution of income or corpus as and when made by the trustees, and in the event liquidation and distribution has not been made of all of the corpus of said trust estate at the end of said ten year period, to have and receive from said trustees upon the expiration of the fixed term hereof, their proportionate part and share of such remaining assets and property of the trust, either in kind or in cash." Provisions were made for mandatory quarterly distributions of not less than $2,000, regardless of earnings, apportioned among the beneficiaries as their interest may be at the time of distribution. It was provided that such distribution could be increased if, in the discretion of the trustees, such additional funds can be distributed without impairing the continued normal and economical administration of the trust. Provisions were *206 made that in event of the death of any named beneficiary, the beneficial share of such beneficiary shall be paid to the heirs, executors, administrators, devisees or trustees of such decedent. The trust instrument further empowered the surviving trustee, in the event of the death or resignation of one trustee, to appoint a successor trustee, provided such successor was selected from the then beneficiaries of the trust and be approved by a majority of such beneficiaries. In the event a successor was not so selected, the Probate Court of Cherokee County, Kansas, upon petition of any beneficiary, was to appoint the successor. The instrument provided for an option, whereby if any beneficiary desired to sell, convey or encumber his or her beneficial interest, the remaining beneficiariess were to have first rights to acquire such interest for a period of 30 days after notice had been given of the desire to sell or encumber. John I. Cooper, one of the two persons designated as trustees in the trust instrument, died during 1951 and was replaced by L. W. Price. Some of the original beneficiaries of petitioner have died since it was created. The operation of the trust was not impaired *207 in any way by the death and replacement of trustees, nor the death of beneficiaries. None of the beneficiaries have exercised the right to transfer their beneficial interest in petitioner. On October 19, 1949, John I. Cooper, H. W. Price and L. W. Price all resided in Cherokee County, Kansas. All the trust real estate was in or near the same county, as was the bank, in which the trust held 315 shares of stock. None of the other beneficiaries resided in Kansas at the time petitioner was created. The real property transferred to petitioner consisted primarily of farm land. One 80 acre tract was strictly mining land and a 600 acre tract also contained some mineral deposits. Both of these tracts were under mineral lease on October 19, 1949 from the testamentary trust. At the expiration of these leases the trustees of petitioner executed new leases on each tract which, in effect, continued the old lease. Since October 19, 1949, the trustees of petitioner have rented the farm land on a sharecrop basis, receiving one-third of the crops grown as rental. On October 29, 1951, petitioner sold approximately 336 acres of its realty and improvements for a total of $23,448.45, realizing a gain *208 of $4,686.40 thereon. The sale of another tract of approximately 80 acres in March 1952 resulted in a loss of $4,600. No other sales of realty have been made. The 315 shares of stock of the Baxter State Bank held by petitioner represented a controlling interest in the bank. There were several small sales of stock between January 10, 1950 and January 3, 1952 which did not affect the control of the bank. The purpose for the sales was to qualify certain persons as directors or cashiers of the bank, or because "it was good business" to sell a few shares to a valued customer. The petitioner realized approximately $9,000 gain from these sales of stock. In accordance with the trust instrument, the trustees prepared statements of receipts and disbursements at the close of each year. The net gain as indicated on these statements for each of the years 1950, 1951, 1952, and 1953 amounted to $55,652.02, $91,505.70, $71,821.98, and $47,861.59, respectively. Distributions to beneficiaries in 1950, 1951, 1952, and 1953 amounted to $57,000, $72,000, $48,000, and $48,000, respectively. At the end of the taxable years 1950, 1951, 1952, and 1953, petitioner had on hand cash in the amounts of $3,999.48, *209 $43,324.39, $75,892.97, and $68,599.02, respectively. As of December 31, 1949, 1950, 1951, 1952 and 1953, the total value of the assets of the trust as shown on the books of the trust was $161,160.99, $159,813.01, $179,318.71, $203,140.69, and $203,002.28, respectively. Petitioner operated under the name of "John I. Cooper and H. W. Price, Trustees," until the death of John I. Cooper. Since his death, the trust has operated under the name of "H. W. Price and L. W. Price, Trustees." The respondent determined that during each of the taxable years 1950, 1951, 1952, and 1953 petitioner was an association taxable as a corporation and determined deficiencies as previously set out. Petitioner was created for the purpose of carrying on a business enterprise and was, during each of the years in question, an association taxable as a corporation. Opinion The sole issue for our determination is whether, during the taxable years before us, the petitioner was an association taxable as a corporation. By statutory definition, the term "corporation" includes "associations." Section 3797(a)(3), Internal Revenue Code of 1939. The term "association", which comes within the meaning of the section, *210 is not so defined but many opinions of this and other courts have given some precision to the meaning. Leading among these opinions are Morrissey v. Commissioner, 296 U.S. 344 and three companion cases decided by the Supreme Court on the same date. [1]
The Morrissey case, supra, discussed two major factors to consider in determining whether or not a trust is an association taxable as a corporation. These considerations are: (1) the purpose for which the trust was formed, and (2) similarity in form between the trust and a corporation. First, it must be found that the purpose for the formation of the trust was to associate together in a joint enterprise for the transaction of business. Second, it must be found that the trust organization in method and form resembles a corporation, "but it is resemblance and not identity." Morrissey v. Commissioner, supra. As to the purpose for which the trust was organized, it has been held that "The parties are not at liberty to say that their *211 purpose was other or narower than that which they formally set forth in the instrument under which their activities were conducted." Helvering v. Coleman-Gilbert Associates, supra.In the instant case, the petitioner contends that it was formed for the sole purpose of orderly liquidation of inherited property. A trust formed solely for liquidating purposes is not formed for the purpose of carrying on a business. Helvering v. Washburn, 99 Fed. (2d) 478, affirming a Memorandum Opinion of this Court, thus stated the rule: "If there is a purpose of immediate liquidation as soon as circumstances will permit, and the carrying on of business is only incidental and necessary for the preservation of the property, no taxable association has resulted." We do not think that it has been shown that such was the purpose in the instant case. The petitioner was created in 1949, at the expiration of a testamentary trust which had been in existence since 1914. Each beneficiary conveyed his or her then interest in the testamentary trust, less cash and Series G bonds, to the petitioner for a term of 10 years. For the most part, these assets consisted of farming and mining properties *212 and sufficient stock in a bank to afford the trust control of the bank. The instrument provided that the income-producing potential of the property in question could be better protected by unified control, management and operation thereof until, in the discretion of the trustees, the property may be sold and converted into cash for distribution. As we have set out more fully in our findings of fact, the trustees were given broad authority to lease property for mining or other purposes, and collect the rents and royalties therefrom; to sell any part or parts of the trust property; to borrow money, pledge or mortgage trust property; to invest in real or personal property; and in general, the trustees were vested with full discretionary power to manage and control the property of the trust. The giving of these powers is not consistent with the contention that the purpose for petitioner was the immediate liquidation of the trust property as soon as circumstances would permit. The only indications in the trust instrument that a purpose for the creation of petitioner was liquidation are the provisions which state that the income-producing potential of the property could best be protected *213 by unified control, etc. until, in the discretion of the trustees, the property may be sold and the proceeds distributed. Even these provisions do not indicate any purpose of immediate liquidation, circumstances permitting. The record indicates conclusively that the parties to the trust did not want to liquidate the trust property but wanted to hold it. As to the stock, a witness who was a trustee of petitioner, testified that only a few minor sales of stock were made by the trust and they were sold only to individuals to qualify them as officers of the bank, or to a valued customer. He testified, "We didn't want to sell any of them [shares of stock]. We were the only one that had any stock available. We had to have directors." He further testified "we thought it was good business" to sell a valued customer of the bank 10 shares of stock. Again he testified that the purpose for trusteeing the stock was "To hold the control of the bank." This certainly does not indicate any liquidating motives immediately or otherwise. In fact, if the true purposes of the parties had been the liquidation of the testamentary trust properties, the bank stock in question was as easily divisible and *214 distributable as the cash which was distributed on the creation of petitioner. But, as petitioner's witness testified, it was retained "To hold the control of the bank." As to the mineral and farm lands held by the trust, there is likewise no evidence of an intent to liquidate. According to petitioner's witness, the only circumstances resulting in a desire not to liquidate the property was that the potential mineral royalty recovery was many times in excess of what the property could be sold for. He stated that, in effect, the beneficiaries were gambling to a certain extent that someone would come along and develop the mineral potential of the property. In other words, it was to the financial advantage of the parties to hold the properties and manage them, hoping that the property would be developed. This is not unlike the purpose of the trust in the Morrissey case, supra, where the land was transferred in trust for the development of a golf course, club houses, etc. and the trust was held taxable as a corporation.
The scope of the business carried on by the petitioner is indicated by the fact that the net gain of the trust, in the four years before us, varied from a low of approximately *215 $47,000 to a high of approximately $90,000. Another indication that liquidation was not the primary purpose of the trust is the fact that at the end of the years before us the trust had undistributed cash on hand varying from a low of approximately $4,000 to a high of approximately $75,000. The trustees were directed to distribute not less than $2,000 quarterly. It was further provided that the trustees could increase such distribution if in the discretion of the trustees "such additional funds can be distributed without impairing the continued normal and economical administration of the trust." This would indicate to us that the continued normal and economical administration of the trust, or in other words, the operation of the business, was more important than distribution or liquidation. As to the form of the trust, most of the salient features of a corporation mentioned in the Morrissey case, supra, are specifically found in the instant case. Title to the trust properties was held by the trustees; management was completely centralized in two trustees; operation of the trust business was not affected by the death of either trustees or beneficiaries; the trustees were a self-perpetuating *216 body, the survivor thereof having the right to appoint a successor trustee; and each beneficiary was given the right to transfer his or her interest in the property. As was suggested in the Morrissey case, supra, the test of corporate similarity in form is applied only to "trusts which have the distinctive feature of being created to enable the participants to carry on a business and divide the gains * * *." This test distinguishes such trusts from partnerships and the similarities "make the trust sufficiently analogous to corporate organization to justify the conclusion that Congress intended that the income of the enterprise should be taxed in the same manner as that of corporations." Morrissey v. Commissioner, supra. We think it has been conclusively demonstrated that the purpose for the creation of petitioner was for the beneficiaries of the testamentary trust to associate together to carry on a business enterprise; that such business was carried on in the years before us; and that the form of the organization is sufficiently analogous to a corporation that it should be taxed as a corporation. Decision will be entered for the respondent. Footnotes
1. Swanson v. Commissioner, 296 U.S. 362; Helvering v. Combs, 296 U.S. 365; and Helvering v. Coleman-Gilbert Associates, 296 U.S. 369↩.